## DISTRICT OF COLUMBIA SUPERIOR COURT
### CIVIL BRANCH
500 Indiana Avenue, NW
Washington, D.C. 20001

---

**U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE HARBORVIEW MORTGAGE LOAN TRUST 2005-16, MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2005-16**
c/o Morris | Hardwick | Schneider, LLC
    9409 Philadelphia Road
    Baltimore, MD 21237

                    Plaintiff,

v.

**ADOLPHUS M. GRANT**   d   *Internal Revenue service @ 500 N. capital st Nw Washington, DC*
1353 Ingraham Street NW
Washington, DC 20011
             Defendant(s).

Case No.: 13 - 0008204

Judge Assigned:
Next Event:

RECEIVED
Civil Clerk's Office

DEC 1 3 2013

Superior Court of the
District of Columbia
Washington, D.C.

---

## COMPLAINT FOR JUDICIAL FORECLOSURE

### ACTION INVOLVING REAL PROPERTY

    U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16 ("Plaintiff") by and through counsel, Mark H. Wittstadt, Gerard Wm. Wittstadt, Jr., David Chen, Patrick Jules, Catherine J. Malycke and Morris | Hardwick | Schneider, LLC, files this action seeking a judicial foreclosure, pursuant to *D.C. Code* and the court's general equitable powers, and in support thereof, states as follows:

### PARTIES AND JURISDICTION

1.    Adolphus M. Grant ("Adolphus M. Grant") is the record owner of certain real property located at 1353 Ingraham Street NW, Washington, DC 20011, more specifically described as:

DCFC - Complaint
DC-93000544-13
2013-11-05 @ 16:05:44 / BK

1



Lot 95 in Square 2803 in a Subdivision made by Lynchburg Investment Corporation of part of a tract of land now known as "Fourteenth Street Terrace", as per plat recorded in Liber 62, at folio 174 in the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia, for assessment and taxation purposes as Lot 0095 Square 2803.

Tax ID: Square 2803/Lot 95

(hereinafter "the Property") by virtue of a title deed, recorded with the Recorder of Deeds at Document Number 2004158168 see attached, Exhibit A.

2. The Property is located within the District of Columbia.

3. Plaintiff is the beneficiary of a Note secured by the Property.

4. The Court has personal jurisdiction over the Defendant herein.

5. Venue is proper in the Superior Court of the District of Columbia.

## FACTS

6. On October 7, 2005, Adolphus M. Grant (hereinafter individually and collectively referred to as "Borrower") encumbered the Property with a Deed of Trust securing a Note in the original principal amount of Six Hundred Thirty Thousand and 00/100 Dollars ($630,000.00), see attached Note, Exhibit B; and Deed of Trust, Exhibit C, both of which are incorporated hereto by reference.

7. The Deed of Trust was recorded with the Recorder of Deeds for the District of Columbia on October 18, 2005 as Document Number 2005149302.

8. The original Lender assigned its rights under the Note and Deed of Trust to Plaintiff, see Exhibit D attached and incorporated hereto by reference. The Plaintiff is the current holder of the Note and beneficiary of the Deed of Trust aforesaid.



9.  On or about May 1, 2010, Borrower defaulted on the Note by failing to make the required payments due and owing under the Note.

10. On or about January 30, 2013, pursuant to the Deed of Trust, Plaintiff caused to be mailed to Borrower a demand letter stating the total amount needed to cure the default, see attached Exhibit E.

11. Borrower failed to cure the default, and therefore, pursuant to the terms of the Deed of Trust, the loan was accelerated.

12. The account is due and owing as of December 5, 2013 for the following:

|     |                          |              |
| --- | ------------------------ | ------------ |
| a.  | Unpaid Principal Balance | $ 708,595.73 |
| b.  | Interest                 | $ 110,752.87 |
| c.  | Escrow Advance           | $ 80,458.96  |
| d.  | Total Fees               | $ 107.78     |
| e.  | Recoverable Balance      | $ 6,456.70   |
|     | Total                    | $ 906,372.04 |

13. Interest, taxes, insurance and other elements of the debt continue to accrue daily.  Costs and legal fees incurred herein may be added to the debt consistent with the Deed of Trust.

14. Department of Defense records indicate Borrower is not in active military duty, see attached Exhibit F.

15. Plaintiff lawfully appointed Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr., ("the Wittstadts") as Substitute Trustees under the Deed of Trust through an Appointment of Substitute Trustees recorded with the Recorder of Deeds for the District of Columbia, see attached Exhibit G.



## COUNT I - Judicial Foreclosure

Plaintiff incorporates by reference all those facts and allegations contained above.

16. D.C. Code §42-803 defines a deed of trust in the District as follows: "The legal estate conveyed ... to a trustee to secure a debt... shall be construed and held to be a qualified fee simple, determinable... by judicial decree for the causes hereinafter mentioned."

17. D.C. Code §42-816 confers equitable power upon the Court in considering applications to foreclose any mortgage or deed of trust to "...instead of decreeing that the mortgagor be foreclosed and barred from redeeming the mortgaged property, to order and decree that said property be sold...."

18. D.C. Code §42-806 permits the court to enter such order and decree as it deems proper to accomplish a foreclosure in equity:

    "Where any bill or bills, suit or suits, shall be filed... under or by virtue of any mortgage or mortgages thereof, to compel the defendant or defendants... to pay the plaintiff... the principal money and interest due on any such mortgage... and in default of payment thereof, to foreclose such defendant or defendants of his, her, or their right or equity of redeeming... such equity court ... may and shall at any time or times... make such order or decree therein... and all parties to such suit or suits shall be bound by such order or decree so made...."

19. The Court is explicitly authorized to take notice of any defenses to the foreclosure by D.C. Code §42-812 and to proceed in equity thereon.

20. Plaintiff is entitled to enforce its Deed of Trust via a judicial foreclosure of the Property.

21. D.C. Code §42-815.02, only applies to a non-judicial foreclosure proceeding under the power of sale clause of the deed of trust, which in this instant case does not apply. Specifically Bill A20-156, which relates to the amendment of the Saving DC Homes from Foreclosure Clarification and Title Insurance Clarification Amendment Act of 2013



states: ...the act shall not apply to actions for judicial foreclosure under section 95 of An Act to establish a code of law for the District of Columbia, approved March 3, 1901 (31 Stat. 1271, D.C. Official Code § 42-816), or any other judicial foreclosure permitted under existing laws. (Signed by Mayor Gray August 20, 2013 with an effective date of December 2, 2013).

22. Neither mediation nor any mediation certificate is required herein.

23. Plaintiff is willing to participate in a mediation conducted by a neutral third-party mediator if Defendant(s) appears and requests the same.

24. Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. have already been appointed as Substitute Trustees for purposes of foreclosure, and have knowledge and experience in the foreclosure field, they should be authorized to carry out the foreclosure by sending notices to affected parties and publishing advertisements consistent with the terms of the Deed of Trust and District of Columbia Code, and thereafter selling the property at auction subject to confirmation or ratification by this Court.

25. Alternatively, Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. may be appointed as Officers of the Court for purposes of selling the Property under SCR-308(b).

26. The Plaintiff should be permitted to submit bid(s) at the sale aforesaid on credit up to the full amount of the debt and all costs incurred under the terms of the Note and Deed of Trust. See D.C. Code § 42-817.

27. After the foreclosure sale, the Substitute Trustees will file with the Court a Verified Report of Sale in compliance with SCR-308(b)(4).

28. The Trustee / Officer appointed to sell the Property is entitled to receive a Trustee's Commission per the Deed of Trust and D.C. Code, and may request the same in the Verified Report of Sale.

29. Pursuant to the Deed of Trust, Plaintiff is entitled to collect all expenses incurred in pursuing the remedies provided under the Deed of Trust, including, but not limited to reasonable attorneys' fees, filing fees, costs of publication, costs associated with the sale, mailing costs, and the costs of title evidence, proof of which will be submitted in the Verified Report of Sale prior to ratification or confirmation.

30. If Defendant(s) has been previously discharged in a Bankruptcy case involving this loan and did not sign a reaffirmation agreement, then this action seeks only to foreclose upon the subject property In Rem and does not seek to collect any debt against Borrower personally or to pursue a deficiency against any discharged Borrower.

**WHEREFORE,** Plaintiff prays this Honorable Court grant the following relief:

A) That this Court find that the Defendant is in default on the mortgage obligation;

B) That this Court Order and appoint Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. to act as Trustee or Officer to sell the real property and improvements thereon known as 1353 Ingraham Street NW, Washington, DC 20011 at public auction and to send appropriate notices and publish advertisements for the same;

C) That Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. should be permitted to auction the Property aforesaid on a date and in a manner deemed appropriate, to continue the auction for a period not to exceed thirty (30) days without further leave of court, and

enter into a contract of sale for the property which contract shall be subject to review and confirmation or ratification by this Court;

D)   That Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. shall be ordered to submit a Verified Report of Sale to this Court within a reasonable time following the auction;

E)   That this Court award all appropriate commissions due to the Trustees and Auctioneer as set forth in the Deed of Trust;

F)   That this Court award the Plaintiff their reasonable attorney fees and costs incurred in the instant action;

G)   That this Court, under such terms and conditions that may be deemed appropriate under the law, enter a deficiency judgment for any non-discharged amounts remaining due on the Note following the completion of the foreclosure; and

H)   That this Court grant such further relief as may be necessary and just under the circumstances.

### COUNT II - Judicial Sale (Alternative)

**Plaintiff incorporates by reference all those facts and allegations contained above.**

28.   To the extent that a judicial foreclosure cannot be had, D.C. Code §42-816 also permits the Court to decree a judicial sale of the entire Property.

29.   A judicial sale would be a sale in absolute, requiring joinder of all lienholders or parties who have an interest in the subject premises.

30.   Lienholders known at this time include:



Internal Revenue Service
Serve On: 500 N. Capitol Street, NW
Washington, DC 20221

District of Columbia Water and Sewer Authority
Serve On: 810 First Street, NE
Washington, DC 20002

Capital One Bank
Serve On: 4330 East West Highway
Suite 900
Bethesda, MD 20814

31.   The inclusion of said additional party will significantly increase the time and expense of

this process to the detriment of the borrower without significant advances in justice or

equity, therefore it is not believed that this approach should be used absent title defects or

other issues which would prevent a normal judicial foreclosure.

32.   No title defects or other issues are known to exist at this time.

33.   To the extent that a defect or issue would be discovered in the course of this action, your

Plaintiff moves this Court to permit amendment of the action to include any necessary

party to accomplish complete justice.

**WHEREFORE,** the foregoing premises considered, to the extent that a judicial

foreclosure cannot be had, your Plaintiff moves this Court to permit amendment of this

Complaint to join all interested parties, to order a judicial sale in satisfaction of the debt owed to

Plaintiff on such terms and conditions the Court may deem appropriate under the law, to enter a

deficiency judgment as to any non-discharged debt, should amounts remain unpaid on the Note

DCFC - Complaint
DC-93000544-13
2013-11-05 @ 16:05:44 / BK

following the sale, and to issue such other and further direction as may be necessary to accomplish complete relief.

### Verification

I solemnly affirm under the penalties of perjury that the account information set forth above is true to the best of my knowledge, information, and belief.

Select Portfolio Servicing, Inc. as Attorney in Fact

U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16

By:                     Katie Rogers

Signature:  _Katie Rogers_  11/21/13

Title:          ~~Document Control Officer~~

State of _Utah_
County/City _Salt Lake_

On this _21st_ day of _Nov._, 2013, before me, the undersigned officer, personally appeared _Katie Rogers_ who is the _Doc Control Officer_ of ✷U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16, known to me (or satisfactorily proven) to be the person whose name are subscribed to the within Verification and acknowledged he/she executed same in his/her capacity as _✷ ✷✷_ for the purposes therein contained.

In witness hereof I hereunto set my hand and official seal.



NOTARY PUBLIC
My Commission expires: 23 Aug. 2017

✷ Select Portfolio Servicing, Inc. as Attorney in Fact

✷✷DOC. CONTROL OFFICER

D. CHAD TRUMP
Notary Public State of Utah
My Commission Expires on:
August 23, 2017
Comm. Number: 669749

Respectfully submitted

Mark Wittstadt, Esq. No. 497735
Gerard Wm. Wittstadt, Jr., Esq. No. 497127
Patrick R. Jules Esq. No. 1011142
David Chen Esq. No. 1000517
Catherine J. Malycke, Esq. No. 1012867
Morris | Hardwick | Schneider, LLC
22375 Broderick Drive, Suite 210
Dulles, Virginia 20166
703-330-3265
dchen@closingsource.net
pjules@closingsource.net
Attorney for Plaintiff



**EXHIBIT A**



LT1-5-2004158166-1

# DEED

**THIS DEED**, made this _9_ day of ~~July,~~ September 2004, between ADOLPHUS M. GRANT and DENISE E. GRANT, tenants by the entireties, parties of the first part, and ADOLPHUS M. GRANT as sole owner, party of the second part;

**WITNESSETH**, that in consideration of $10.00 and other good valuable consideration, the parties of the first part do hereby grant unto the party of the second part, in fee simple, as sole owner, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in District of Columbia, described as follows, to wit:

Lot numbered ninety five (95) in the subdivision made by the Lynchburg Investment Corporation of lots in square numbered twenty eight hundred three (2803) "Maple Grove Farm" called "Fourteenth Street Terrace", as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 62 at Folio 174.

Said property has the address of 1353 Ingraham Street, N.W., Washington, D.C. 20011.

**WITNESS** the hands and seals of the parties of the first part.



_____ (SEAL)
ADOLPHUS M. GRANT

_____ (SEAL)
DENISE E. GRANT

ARTHUR CAMERON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires June 15, 2005

2

DISTRICT OF COLUMBIA ss:

I, ~~Adolphus M Grant~~ *Malquinnette Atkins*, a Notary Public in and for the said jurisdiction do hereby certify that **ADOLPHUS M. GRANT**, who is personally well known to me as the person who executed the foregoing and annexed Deed bearing date on the _9_ day of September 2004, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed.

My Commission Expires:

Thelminnette Atkins
Notary Public, District of Columbia
My Commission Expires March 31, 2008

_Thelminnette Atkins_
Notary Public

DISTRICT OF COLUMBIA ss:

I, _Appollo Cameron_, a Notary Public in and for the said jurisdiction do hereby certify that DENISE E. GRANT, who is personally well known to me as the person who executed the foregoing and annexed Deed bearing date on the _29th_ day of _July_, 2004, personally appeared before me in said jurisdiction and acknowledged the same to be her act and deed.

My Commission Expires:

APPOLLO CAMERON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires June 15 2006

_Appollo Cameron_
Notary Public

Return after recording to:
Mr. Adolphus M. Grant
1353 Ingraham Street, N.W.,
Washington, DC 20011

Doc# 2004158158 Fees:$40.50
11/18/2004    2:37PM Pages 4
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

$    34.00
$    6.50

RECORDING
SURCHARGE

**EXHIBIT B**

006038   cc# 40946



ORIGINAL

CHL #:
Loan Number 70305857
MIN# 100073800000272420

## ADJUSTABLE RATE NOTE
(MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

OCTOBER 7, 2005          BALTIMORE          MARYLAND
[Date]                   [City]             [State]

1353 INGRAHAM STREET NW, WASHINGTON, D.C. 20011
[Property Address]

### 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   630,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed  ( ONE HUNDRED FIFTEEN PERCENT (115.00%) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is   AMERICAN RESIDENTIAL MORTGAGE
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST

(A)  Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.3750 %.  The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B)  Interest Rate Change Dates

The interest rate I will pay may change on the   1ST   day of DECEMBER, 2005    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C)  Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND ONE-QUARTER          percentage point(s) 3.2500   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.9500   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3.   PAYMENTS

(A)  Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the   1ST   day of each month beginning on DECEMBER, 2005         .  I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Principal. If, on   NOVEMBER 1, 2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   136 GAITHER DRIVE, MOUNT LAUREL, NEW JERSEY  08054
or at a different place if required by the Note Holder.

006039

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$   2,136.67        unless adjusted under Section 3 (F).

**(C)   Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the   1ST        day
of  DECEMBER, 2006   , and on that day every 12th month thereafter. Each of these dates is called a "Payment
Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a
different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my
monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G)
below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative
amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or
as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the
monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment
Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the
month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless
Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will
not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap."
This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments
Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the
amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below
requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and
the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)   Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly
payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less
than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay
the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. For each month that my monthly payment is less than the interest portion, the Note Holder will
subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to
my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by
Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will
apply the payment as provided in Section 3 (A).

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to    115.00    percent of the Principal
amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments
and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to
exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change
more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new
Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the
Maturity Date in substantially equal payments at the current interest rate.

**(G)   Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will
begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will
begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)   Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment
options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the
following Payment Options:
      (i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment
      at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is
      only available if the interest portion exceeds the Minimum Payment.
      (ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at
      the Maturity Date in substantially equal payments.
      (iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest)
      within a fifteen (15) year term from the first payment due date in substantially equal payments. This
      monthly payment amount is calculated on the assumption that the current rate will remain in effect for
      the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

006040

**4.   NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A)   Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0      % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

006041 

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
ADOLPHUS M. GRANT                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

WITHOUT RECOURSE PAY TO THE ORDER OF
COUNTRYWIDE BANK, N.A.
AMERICAN RESIDENTIAL MORTGAGE
BY: _____
        (Signature of Corporate Officer)
TITLE: __Vicki Sanchez - Asst. Vice President__
        (Printed Name and Corporate Title)

PayOption ARM Note - MTA Index                Page 4 of 4                    10/04
FE-5312 (0412)

PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE

COUNTRYWIDE BANK, N.A.

BY: *Laurie Meder*

LAURIE MEDER

SENIOR VICE PRESIDENT

PAY TO THE ORDER OF

WITHOUT RECOURSE

COUNTRYWIDE HOME LOANS, INC.

BY: [signature]

David A. Spector

Managing Director

**EXHIBIT C**

006043


LT1-5-2005149302-1

After Recording Return To:

AMERICAN RESIDENTIAL MORTGAGE
136 GAITHER DRIVE
MOUNT LAUREL, NEW JERSEY 08054

**COSMOPOLITAN REAL ESTATE
SETTLEMENTS, INC.**
8555 16th Street, Suite 202
Silver Spring, Maryland 20910
Case # 05-1256 MK


LT2-0-0-21

――――――――― [Space Above This Line For Recording Data] ―――――――――

Loan Number 70305857
MERS Number 100073800000272420

## DEED OF TRUST

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 7, 2005, together with all Riders to this document.

(B) "Borrower" is ADOLPHUS M. GRANT. Borrower's address is 1346 HEMLOCK STREET NW, WASHINGTON, D.C. 20012. Borrower is the trustor under this Security Instrument.

(C) "Lender" is AMERICAN RESIDENTIAL MORTGAGE. Lender is a CORPORATION organized and existing under the laws of THE STATE OF PENNSYLVANIA. Lender's address is 136 GAITHER DRIVE, MOUNT LAUREL, NEW JERSEY 08054.

(D) "Trustee" is COSMOPOLITAN REAL ESTATE SETTLEMENTS, INC., 8555 16TH STREET, #202 SILVER SPRING, MD 20910. Trustee's address is _____.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated OCTOBER 7, 2005. The Note states that Borrower owes Lender SIX HUNDRED THIRTY THOUSAND AND 00/100ths Dollars (U.S.$630,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2035.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider

☐ Balloon Rider     ☐ Planned Unit Development Rider     ☐ Prepayment Penalty Rider

☒ 1-4 Family Rider     ☐ Biweekly Payment Rider

Borrower Initials _____

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3009 1/01 (rev. 5/02) (page 1 of 11 pages)

Commitment for Title Insurance — Refinance/Second                                    **Exhibit A**

## THE SECURITY TITLE GUARANTEE CORPORATION OF BALTIMORE

| Commitment No. | | Agent File No. |
|---|---|---|
| 847667 | LEGAL DESCRIPTION | 05-1256MA |

Lot 95 in Square 2803 in a subdivision made by Lynchburg Investment Corporation of part of a tract of land now known as "FOURTEENTH STREET TERRACE", as per plat recorded in Liber 62 at folio 174 in the Office of the Surveyor for the District of Columbia.

Tax ID:  Square 2803/Lot 95

ST-N-9B, Exhibit A
(3/94)

006044

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the ___District___ of ___Columbia___ :

                         [Type of Recording Jurisdiction]         [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION

which currently has the address of   **1353 INGRAHAM STREET NW**
                                                [Street]

Washington, District of Columbia ___20011___ ("Property Address"):
                       [Zip Code]

Borrower Initials

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3009 1/01 (rev. 5/02) (page 2 of 11 pages)

006045

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance

Borrower Initials _____

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3009  1/01 (rev. 5/02) (page 3 of 11 pages)

006046

premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

Borrower Initials

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3009 1/01 (rev. 5/03) (page 4 of 11 pages)

006047

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Borrower Initials

006048

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Borrower Initials _____

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3009  1/01 (rev. 5/02) *(page 6 of 11 pages)*

006049

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

006050

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Borrower Initials _____

006051

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for

Borrower Initials _____

006052

purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of $_____ or _____% of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

006053

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
ADOLPHUS M. GRANT                         -Borrower

Please type or print Borrower's address

1346 HEMLOCK STREET NW

WASHINGTON, D.C. 20012

_____ (Seal)
                                          -Borrower

Please type or print Borrower's address

1346 HEMLOCK STREET NW

WASHINGTON, D.C. 20012

Lender's Name and Address:
AMERICAN RESIDENTIAL MORTGAGE
136 GAITHER DRIVE
MOUNT LAUREL, NEW JERSEY  08054

Trustee's Name and Address:
COSMOPOLITAN REAL ESTATE SETTLEMENTS, INC.
8555 16TH STREET, #202  SILVER SPRING, MD 20910

THE STATE OF  MARYLAND        )
County of  Montgomery         )

This instrument was acknowledged before me on  OCTOBER 7, 2005 by  ADOLPHUS M. GRANT.

(Seal)

_____
Signature of Notarial Officer

My commission expires:  3/1/7

Title  Notary Public

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3009  1/01 (rev. 5/03) (page 11 of 11 pages)

006054

# 1-4 FAMILY RIDER
## (Assignment of Rents)

Loan Number 70305857

THIS 1-4 FAMILY RIDER is made this 7TH day of OCTOBER, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to AMERICAN RESIDENTIAL MORTGAGE (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 1353 INGRAHAM STREET NW, WASHINGTON, D.C. 20011

[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

F. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G. ASSIGNMENT OF LEASES. Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

Borrower Initials

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3170  1/01 *(page 1 of 3 pages)*

006055

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Borrower Initials _____

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3170 1/01 *(page 2 of 3 pages)*

006056

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
ADOLPHUS M. GRANT                    Borrower

_____ (Seal)
                                    Borrower

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3170  1/01 (page 3 of 3 pages)

006057

Doc ID#: 70305857                                         CHL #:

## ADJUSTABLE RATE RIDER

### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this        7TH          day of    OCTOBER, 2005
, and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICAN RESIDENTIAL MORTGAGE
("Lender") of the same date and covering the property described in the Security Instrument and
located at:         1353 INGRAHAM STREET NW, WASHINGTON, D.C. 20011

[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2.   INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of     1.3750 %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the    1ST       day of DECEMBER, 2005
, and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

PayOption MTA ARM Rider
FE-5315 (0505)                          Page 1 of 5

006058

**(C)  Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND ONE-QUARTER percentage point(s)  3.2500    % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.9500   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the  1ST                 day of each month beginning on DECEMBER, 2005       .  I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    NOVEMBER 1, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  136 GAITHER DRIVE,  MOUNT LAUREL, NEW JERSEY 08054
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 2,136.67              unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the   1ST day of   DECEMBER, 2006      , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

PayOption MTA ARM Rider
FE-5318 (0505)                              Page 2 of 5

006059

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E)  Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE          HUNDRED FIFTEEN          percent ( 115.00     %)of the Principal amount  I  originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**PayOption MTA ARM Rider**
**FE-5315 (0505)**                            Page 3 of 5

008060

**(H)  Payment Options**
After the first interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

> (i)  Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
>
> (ii)  Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
>
> (iii)  15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

> Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

PayOption MTA ARM Rider
FE-5315 (0505)                          Page 4 of 5

006061

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____
ADOLPHUS M. GRANT                                    -Borrower

_____
                                                     -Borrower

_____
                                                     -Borrower

_____
                                                     -Borrower

PayOption MTA ARM Rider
FE-5315 (0505)                    Page 5 of 5

★ ★ ★

**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
515 D Street, NW
Washington, DC 20001
Phone (202)727-5374

## SECURITY AFFIDAVIT — CLASS 1

| 2803 | | 0095 |
|------|--------|------|
| **Square** | **Suffix** | **Lot** |

I, (We) _____**Adolphus M. Grant**_____ the owner(s) of the real property described within certify, subject to criminal penalties for making false statements pursuant to section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2405), that the real property described within is Class 1 Property, as that class of property established pursuant to D.C. Official Code 47-813(C-6)(2).

X _____
Signature

_____
Signature

Subscribed and sworn to me before this   7th   day of   October   , 2005  .

_____
Notary Public

My Commission Expires:   3/1/7
                          mmdd/yyyy

DocH 2005149302 Fees:$159.50
10/18/2005   11:00AM Pages 21
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

RECORDING        $     153.00
SURCHARGE        $       6.50

**EXHIBIT D**

Doc# 2011103450

Recording Requested By:
Bank of America
Prepared By: Barbara Nord
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

DocID# 96610551487917687

Tax ID:    SQUARE 2803/LOT 95

Property Address:
1353 Ingraham St NW
Washington, DC 20011-3603
DC0-ADT 14578439        9/21/2011

This space for Recorder's use

MIN #: 100073800000272420        MERS Phone #: 888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is 3300 S.W. 34th Avenue, Suite 101 Ocala, FL 34474 does hereby grant, sell, assign, transfer and convey unto U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF HARBORVIEW 2005-16 TRUST FUND whose address is 209 LASALLE ST 3 FL, CHICAGO, IL 60604 all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Original Beneficiary:    AMERICAN RESIDENTIAL MORTGAGE
Borrower(s):        ADOLPHUS M. GRANT
Original Trustee:    COSMOPOLITAN REAL ESTATE SETTLEMENTS, INC.
Date of Deed of Trust: 10/7/2005    Original Loan Amount: $630,000.00
Recorded in District of Columbia County, DC on: 10/18/2005, book N/A, page N/A and instrument number 2005149302

Property Legal Description:
LOT 95 IN SQUARE 2803 IN A SUBDIVISION MADE BY LYNCHBURG INVESTMENT CORPORATION OF PART OF A TRACT OF LAND NOW KNOWN AS "FOURTEENTH STREET TERRACE", AS PER PLAT RECORDED IN LIBER 62 AT FOLIO 174 IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA.  TAX ID: SQUARE 2803/LOT 95

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
9-21-2011

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____
    Barbara Nord Assistant Secretary

State of California
County of Ventura

On Sep. 28, 2011 before me, ROUDABEH BEYGZADEH-ELIAS, NOTARY PUBLIC, Notary Public, personally appeared Barbara Nord, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: _____        (Seal)
My Commission Expires: June 4, 2015

ROUDABEH BEYGZADEH-ELIAS
Commission # 1936621
Notary Public - California
Los Angeles County
My Comm. Expires Jun 4, 2015

Doc# 2011103450
Filed & Recorded
10/12/2011    15:15:48 PM
LARRY TODD
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  E-RECORD                    $        20.00
  ESURCHARGE                   $         6.50
Total:                         $        26.50

**EXHIBIT E**

Select Portfolio Servicing, Inc.
PO BOX 9003
Temecula, CA 92589-9003



7196 9006 9296 5214 8750

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

Send Payments to:
Select Portfolio Servicing, Inc.
Attn: Remittance Processing
P.O. Box 65450
Salt Lake City, UT 84165-0450

Send Correspondence to:
Select Portfolio Servicing, Inc.
Customer Service
P.O. Box 65250
Salt Lake City, UT 84165-0250

20130131-55

ADOLPHUS M GRANT
1346 HEMLOCK ST NW
WASHINGTON, DC 20012-1551



LR066

 SELECT
Portfolio
SERVICING, inc.

Sent Via Certified Mail
7196 9006 9296 5214 8750

01/30/2013

ADOLPHUS M GRANT
1346 HEMLOCK ST NW
WASHINGTON, DC 20012-1551

### DEMAND LETTER - NOTICE OF DEFAULT

### NOTICIA DE OMISIÓN

RE:     Loan Number: 0014336424 secured by real property located at
        1353 INGRAHAM STREET NW
        WASHINGTON, DC 20011

Dear Customer:

This letter constitutes formal notice of default under the terms of the Note and Deed of Trust or Mortgage as a result of your failure to make payments as required by the Note and Deed of Trust or Mortgage. Your loan is currently due and owing for the 05/01/2010 payment and subsequent payments. As of the date of this letter, the total amount required to cure these defaults on your loan is $97,829.69 which consists of the following:

| | |
|---|---|
| 33 Months Delinquent Payments | |
| (05/01/2010 through 01/01/2013) | $93,384.39 |
| Accrued late charges | $0.00 |
| Accrued Interest | $0.00 |
| Funds advanced on customer's behalf | $4,445.30 |
| Escrow advance balance | $0.00 |
| Other fees | $0.00 |
| Total Amount Outstanding | $97,829.69 |
| Unapplied balance | $0.00 |
| **Amount required, as of 01/30/2013, to cure the default** | **$97,829.69** |

It is possible that after payment of the amounts detailed above there may be other fees still due and owing, including but not limited to other fees, escrow advances or corporate advances that SPS paid on your behalf or advanced to your account.



LR066

This letter is a formal demand to pay the amount due. If this amount is not paid to Select Portfolio Servicing, Inc. (SPS) within 30 days of the date of this letter, the entire unpaid balance, together with accrued interest, fees and expenses, may be ACCELERATED and your loan may be referred to outside counsel to commence foreclosure actions. Our acceptance of one or more payments for less than the amount required to cure the default shall not be deemed to reinstate your loan or waive acceleration of the loan. You have the right to cure the default on this loan if, on or before 30 days of the date of this letter, you do the following:

1. Pay the amounts due on your loan as set forth above.

2. Cure all breaches of any other covenants or agreements made by you in the Note and Deed of Trust or Mortgage.

3. Take such actions, which SPS may reasonably require, to assure the lien and interest in the property is protected.

You may incur additional fees after the date of this letter, pursuant to the terms of your mortgage documents. Payment of these additional fees may not be required to cure the default, but may be required to bring your loan current.
If foreclosure is initiated, additional amounts for attorney fees and costs may be incurred. These sums can be significant and will be added to amounts due. This may reduce your equity, if any, in the property.

SPS provides consumer assistance programs designed to help resolve delinquencies and avoid foreclosures. These services are provided without cost to our customers. You may also be eligible for a loan workout plan or other similar solution. If you would like to learn more about these programs, you may contact a SPS representative at (888) 818-6032 during the following hours:

Monday through Thursday, 8 a.m. to 10 p.m.
Friday, 8 a.m. to 7 p.m.
Saturday, 9 a.m. to 1 p.m.
Eastern Time

If you wish to dispute your delinquency, you may do so by providing a written dispute to SPS at the following address:

Select Portfolio Servicing, Inc.
Attention: Consumer Advocacy Department
P.O. Box 65277
Salt Lake City, UT 84165-0277

You also have the right to bring a court action if you claim that the loan is not in default or if you believe that you have any other defense to the acceleration and sale. We are also required by law to inform you that if you notify us you do not wish us to contact you by telephone at your place of employment, then no such contact by telephone will be made.

If you are represented by an attorney, SPS will work with your attorney. We will also work with housing counselors, consumer debt counselors and other representatives with your written authorization. If you are represented by an attorney, this letter is being mailed to you to forward to your attorney. We will release information to your attorney without further authorization. If you wish to have information regarding your account provided to individuals or groups other than your attorney, your signed written authorization (including your social security number) is required.

SPS intends to invoke specific remedies within your Deed of Trust or Mortgage as applicable. This letter is being sent as notification of those remedies.

Please contact a SPS representative at (800) 635-9698 to determine the exact amount due and to arrange for payment. SPS requires all delinquent installments to be paid by CASHIER'S CHECK OR MONEY ORDER. PLEASE PROVIDE PAYMENTS TO THE FOLLOWING ADDRESS:

> Select Portfolio Servicing, Inc.
> PO BOX 65450
> Salt Lake City, UT 84165-0450

If you are a debtor in bankruptcy or have been discharged in bankruptcy:

Please be advised that if you are a debtor in bankruptcy or have been discharged in bankruptcy, this statement does not represent and is not intended to be a demand for payment. In such cases, this letter is provided for you for information purposes only and is not an attempt to collect a debt. You should consult legal counsel regarding your obligations, if any, to pay the mortgage loan.

Home ownership counseling may be available to you by contacting a HUD-approved counseling agency. Call (800) 569-4287 or TDD (800) 877-8339 for the housing counseling agency nearest you.

**Esta carta contiene información importante concerniente a sus derechos. Por favor, hágala traducir. Nuestros representantes bilingües están a su disposición para contestar cualquier pregunta llamando al teléfono (800) 831-0118 y marque la opción 2.**

Sincerely,

Select Portfolio Servicing, Inc.



**EXHIBIT F**

Results as of : Nov-15-2013 11:37:10

Department of Defense Manpower Data Center

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>GRANT</u>
First Name: <u>ADOLPHUS</u>
Middle Name:
Active Duty Status As Of: <u>Nov-15-2013</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty. HOWEVER, WITHOUT A SOCIAL SECURITY NUMBER, THE DEPARTMENT OF DEFENSE MANPOWER DATA CENTER CANNOT AUTHORITATIVELY ASSERT THAT THIS IS THE SAME INDIVIDUAL THAT YOUR QUERY REFERS TO. NAME AND DATE OF BIRTH ALONE DO NOT UNIQUELY IDENTIFY AN INDIVIDUAL.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via the "defenselink.mil" URL: http://www.defenselink.mil/faq/pis/PC09SLDR.html. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

## Certificate ID: C5J5543AW041A20

**EXHIBIT G**



LT1-5-2013122009-1

Return to:
Morris | Hardwick | Schneider, LLC
9409 Philadelphia Road
Baltimore, MD 21237



LT2-0-0-3

## DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEES

This Deed of Appointment of Substitute Trustees made this ____*10*____ day of _*October*_, 2013,

by U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage

Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16 who hereby designate and

appoint Mark H. Wittstadt and Gerard Wm. Wittstadt, Jr. as Substitute Trustees (either of whom may act

independently of the other) in the place and stead of Cosmopolitan Real Estate Settlements, Inc. as Trustees.

WHEREAS, under a certain Deed of Trust, dated October 7, 2005 and recorded among the Land

Records of District of Columbia, in Instrument #2005149302, the hereinafter described property was

conveyed to Cosmopolitan Real Estate Settlements, Inc., as Trustee, to secure a Note of even date therewith

in the amount of $630,000.00 executed by Adolphus M. Grant and on the following secured property, to wit:

FOR LEGAL DESCRIPTION SEE ATTACHED EXHIBIT A

WHEREAS, the Deed of Trust provides that the Noteholders shall have the right and power to

substitute one or more of the Trustees in place of the original Trustees named in the said Deed of Trust.

NOW, THEREFORE, U.S. Bank National Association, as Trustee for the Certificate Holders of

the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16 ,

the current holder(s) of the Note described herein and secured by the aforesaid Deed of Trust and in exercise

of the powers contained in the said Deed of Trust do hereby nominate, designate and appoint MARK H.

WITTSTADT and GERARD WM. WITTSTADT, JR as substitute trustees in the place and stead of

DCFC - Deed Appt Of Substitute Trustees
DC-93000544-13
2013-09-23 @ 16:41:19 / CB

*8550318*

Cosmopolitan Real Estate Settlements, Inc. with all powers, rights, duties and authority of the superseded Trustees.

WITNESS the hands and seals of the said Noteholders.

Select Portfolio Servicing, Inc. as Attorney in Fact

U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16

By

Signature: _____ Adam Shields _____

Title: Document Control Officer

State of _Utah_

County/City _Salt Lake_

Select Portfolio Servicing, Inc. as Attorney In Fact

On this _10_ day of _Oct_, 2013, before me, the undersigned officer, personally appeared _Adam Shields_ who is the DOC. CONTROL OFFICER of U.S. Bank National Association, as Trustee for the Certificate Holders of the HarborView Mortgage Loan Trust 2005-16, Mortgage Loan Pass-Through Certificates, Series 2005-16 (Noteholder), known to me (or satisfactorily proven) to be the person whose name are subscribed to the within Deed of Appointment of Substitute Trustees and acknowledged he/she executed same in his/her capacity as _____ for the purposes therein contained. DOC. CONTROL OFFICER

In witness hereof I hereunto set my hand and official seal.

NOTARY PUBLIC

My Commission expires:

AUG 2 3 2017

GINA MECHAM
Notary Public State of Utah
My Commission Expires on:
August 23, 2017
Comm. Number: 669743

DCFC - Deed Appt Of Substitute Trustees
DC-93000544-13
2013-09-23 @ 15:41:19 / CB

*8550318*

## EXHIBIT A

Lot 95 in Square 2803 in a Subdivision made by Lynchburg Investment Corporation of part of a tract of land now known as "Fourteenth Street Terrace", as per plat recorded in Liber 62, at folio 174 in the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia, for assessment and taxation purposes as Lot 0095 Square 2803.

Tax ID: Square 2803/Lot 95

Doc# 2013122809 Fees:$31.50
10/25/2013   2:32PM Pages 3
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

```
RECORDING           $      25.00
SURCHARGE           $       6.50
```

DCFC - Deed Appt Of Substitute Trustees
DC-53000544-13
2013-09-23 @ 16:41:19 / CB

*8550318*